This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Holly Brooks, has appealed from the judgment of the Wayne County Court of Common Pleas, Juvenile Division, terminating her parental rights to her three children, and placing them in the permanent custody of the Wayne County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Appellant is a 25 year-old biological mother of three children, A.C., born April 2, 1995; B.D., born May 23, 2000; and M.B., born October 23, 2001. She has a history of mental health issues, including bipolar disorder, anti-social personality traits, and poly-substance abuse. Each of the children has a different putative father, none of whom has been involved in the lives of the children.
 {¶ 3} CSB has been involved with the family on two separate occasions. The agency initially became involved with them in 1997 and filed a complaint alleging that appellant's first child was dependent. The child was placed in the protective supervision of CSB. Sometime thereafter, appellant moved to Florida without notifying CSB. An investigation was opened in Florida by its children services agency upon receipt of a referral in that state as well. Eventually, CSB's case regarding appellant's first child was resolved with custody being returned to appellant on August 23, 2000.
 {¶ 4} Two months later, CSB received reports regarding bruises on the face of appellant's first child and a lack of food in appellant's home. By this time, appellant's second child had been born. CSB made an unannounced visit to the home and was unable to get appellant to answer the door. The police were called to assist and forced entry into the home. There was an outstanding warrant for appellant's arrest and she was consequently detained by the police. The children were placed in the custody of CSB pursuant to Juv.R. 6 on October 26, 2000. Appellant was assessed and transferred to Heartland Behavioral Healthcare ("Heartland") because of mental health concerns.
 {¶ 5} On October 27, 2000, CSB filed the complaint, which forms the basis of the present action, alleging that the children were neglected and/or dependent and seeking temporary custody. The adjudication hearing was continued twice because of hospitalizations of appellant. Eventually, appellant stipulated to a finding of dependency and the children were continued in the temporary custody of CSB and have remained there through the time of the permanent custody hearing.
 {¶ 6} Appellant's third child was born on October 24, 2001 and was placed in the emergency temporary custody of CSB, pursuant to a complaint filed October 26, 2001. The complaint alleged dependency because of concerns regarding appellant's mental health. Hospital personnel reported that appellant had been demonstrating erratic behavior since her admission to the hospital for the birth of the child. She reportedly signed herself out against medical advice when dilated and attempted to leave during delivery. Subsequently, the child was adjudicated to be dependent and also placed in the temporary custody of CSB, where she, too, remained through the time of the permanent custody hearing.
 {¶ 7} Appellant's case plan required her to obtain mental health services and stabilize her mental health, maintain sufficient food in her home for her children, and maintain safe and stable housing. An amendment to the case plan was adopted in April 2001, which also required appellant to comply with the terms of probation, imposed relative to a conviction. Those terms required her to obtain alcohol, drug and mental health assessments, participate in counseling, and submit to weekly drug tests.
 {¶ 8} Ultimately, appellant filed a motion to terminate the temporary custody of CSB and CSB filed motions seeking the permanent custody of the children. The matter proceeded to a hearing on all motions on August 5, 6, and 7, 2002. At the conclusion of the hearing, the juvenile court terminated the parental rights of appellant and all putative fathers, and placed the children in the permanent custody of CSB. The fathers have not appealed.[1] Appellant has appealed from the judgment below and has assigned one error for review.
 II. Assignment of Error THE JUDGEMENT OF THE JUVENILE COURT TERMINATING THE PARENTAL RIGHTS OF HOLLY BROOKS WITH REGARD TO HER WITH REGARD TO HER CHILDREN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 ¶ 9 When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozman (Apr. 14, 1999), Summit App. No. 18983. In determining whether a criminal conviction is against the manifest weight of the evidence:
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 10} Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
 {¶ 11} The testimony presented at the permanent custody hearing may be summarized as follows. Dr. Roy Vellanki, a psychiatrist at Heartland, testified that he had diagnosed appellant with bipolar disorder, manic type severe, poly-substance abuse, and anti-social personality traits. Dr. Vellanki explained that bipolar disorder is characterized by prominent mood symptoms, psychomotor restlessness, poor concentration, irritable moods, and impulsive, risk-taking behaviors. Symptoms of appellant's anti-social personality traits included irritable behavior, use of profane language, aggression towards the medical staff, denial of aggressive behavior, and blaming her behavior on the others. Appellant also reported episodes of substance abuse to Dr. Vellanki.
 {¶ 12} Dr. Vellanki stated that many people with bipolar disorder are successful parents, but opined that appellant's prognosis, in particular, is poor because of the chronic nature of her condition, coexisting substance abuse, anti-social personality traits, history of non-compliance with medications, and limited insight regarding her condition. He testified that appellant's lack of compliance with medication also places her at risk for self-injury or violence.
 {¶ 13} Kathy Smith, a caseworker with CSB, testified regarding CSB's earlier involvement with appellant. Ms. Smith was assigned to the case in May 1998. At that time, CSB already had protective supervision over the oldest child, and appellant was found to have left the state of Ohio without advising CSB. A protective services alert was therefore placed into effect. The Florida Department of Family and Children contacted CSB when they received a referral regarding appellant.
 {¶ 14} Thereupon, CSB sought and obtained emergency temporary custody of the child. The existing Florida caregiver was thought to have been providing appropriate care; therefore, the child remained in Florida and the local children services agency worked toward a goal of reunification. After a period of time, the child was found to be having little or no contact with appellant due to mental health hospitalizations and criminal incarcerations. As a result, the child was returned to Ohio on September 18, 1998 to live with her maternal aunt, Kelly Brooks. Ms. Brooks obtained legal custody of the child on June 1, 1999. Because of appellant's continued hospitalization, there was no visitation between appellant and the child from September 1998 through June 1999. When appellant returned to Ohio, she sought custody of her child and did obtain custody on August 23, 2000.
 {¶ 15} Dan Hussar, a social worker at Heartland, testified regarding his work with appellant during five different mental health hospitalizations. All of the hospitalizations were related to her bipolar disorder and were for non-compliance with her prescribed medications.
 {¶ 16} In appellant's most recent hospitalization, from May 11, 2002 until May 16, 2002, she was admitted for depression and suicidal ideation. In her March 17, 2002 through March 29, 2002 hospitalization, she was manic and erratic, but believed that she had no problems. Mr. Hussar expressed concern regarding appellant's inability to take care of herself.
 {¶ 17} Jim Roth, an employee of the Wayne County Municipal Court Probation Department, testified that appellant was placed on probation on March 8, 2001 for three years. Appellant violated the terms of her probation on two different occasions: testing positive for marijuana at least twice, failing to report to her probation officer, use or possession of alcohol, and having a conviction for disorderly conduct. Her probation was, therefore, extended until March 8, 2006.
 {¶ 18} Bryan Gerber has been appellant's case manager through the Counseling Center since 1999. Mr. Gerber testified that in the year 2000, appellant had custody of her two older children. She reported feeling better with her children around, but also displayed symptoms of depression and delusions. Appellant also had some hospitalizations during that time period.
 {¶ 19} Mr. Gerber explained that appellant was currently receiving medical services, case management services, and partial hospitalization services. The latter program involved group therapy. Appellant had also previously been seeing a substance abuse/mental health therapist. The witness testified that appellant had shown improvement recently as compared to her condition in 1999 or 2000. In addition, he reported that appellant has maintained independent housing, maintained food in the house, kept herself and her home neat and clean, and has not been involved with inappropriate individuals.
 {¶ 20} However, Mr. Gerber also testified that appellant has been hospitalized six times in the last eight months, and therefore, has not demonstrated stability in terms of her mental health. Just three months earlier, appellant was displaying depression, anger and agitation. Mr. Gerber testified that appellant threatened that "if her children were taken away there was going to be a murder or something like this and [she] didn't care if she was going to spend the rest of her life in prison." Mr. Gerber explained that over the course of his working relationship with appellant, she has had a continuing problem with not attending all of her medical appointments and not following her doctor's recommendations on a consistent basis.
 {¶ 21} Mark Weaver, director of the crisis center at the Counseling Center, testified that he had recommended hospitalization for appellant two or three times over the last several years because she was a risk to herself. His last contact with appellant was on May 8, 2002 when she called him, seeking admission to the hospital. Appellant told him she was distressed, not sleeping or eating, and had thoughts of taking an overdose and hurting her caseworker, Shawn Pedani, by stabbing him in the face. Mr. Weaver recommended that she go to the hospital emergency room, which she did. Once at the hospital, appellant denied being suicidal or homicidal.
 {¶ 22} Testimony regarding supervised visitations was presented. There were weekly two-hour visitations scheduled, with separate visitations for the baby added later. In 2001, appellant attended 44 of 51 scheduled visitations, or 86 per cent. In 2002, appellant attended 30 of 81 scheduled visitations, or 37 per cent. Of the 51 visitations she failed to attend in 2002, 16 were missed because of hospitalizations and 30 were missed because appellant either failed to confirm the visit or simply did not show up. The remainder were canceled because of illness or conflicts. Appellant testified that she missed visits in recent months because it upset her to be around CSB workers, and in particular, her caseworker.
 {¶ 23} Comments expressed by witnesses who supervised visitations varied. There were some examples of very positive interactions: having fun playing with a Frisbee and their dog in the yard, washing a doll together in the kitchen sink, planning appropriate birthday parties for the children, bringing Easter baskets to the children, playing board games with the oldest child, laughing and giggling together, and showing concern for the care and welfare of her children.
 {¶ 24} There were also many negative comments. Some concerns might be considered minor, such as complaints that appellant wanted to cut skin-irritating tags out of the children's clothing; followed the middle child around to clean up after her; braided a child's hair, though she did not want it braided; and attempted to feed children when they were not hungry.
 {¶ 25} Others were more significant. Those concerns included: criticisms or threats made about the foster parents or CSB workers in front of the children causing distress for the oldest child and otherwise pulling small children into issues over which they had no control;[2]
sleeping or exhibiting depression during visits, causing relatives to take over the visit if they were present; demonstrating a lack of interaction with one or more of the children; and rocking the baby harshly, and when approached about it, calling the caseworker "a dumb fuck."
 {¶ 26} Shawn Pedani, the CSB caseworker assigned to appellant's case in October 2000, testified regarding appellant's history of hospitalizations for mental health reasons. In 1997, appellant was hospitalized five times for a total of 28 days. In 1998-1999, she was hospitalized ten times in Florida for a total of 392 days. In 2000 through January of 2001, she was hospitalized five times for 165 days. There were no additional hospitalizations until December 2001. From then until the August 2002 permanent custody hearing, appellant was hospitalized six times for a total of 57 days with her last hospitalization being two and one-half months before the permanent custody hearing.
 {¶ 27} Mr. Pedani also testified regarding CSB home studies that were completed toward the possibility of relative placements. Appellant's mother and her husband were not approved because of recent felony charges. Appellant's father and step-mother were not approved and also withdrew their names from consideration. Appellant's grandparents withdrew because of age and health concerns. Kelly Brooks, appellant's sister, had legal custody of the children at one time, but declined to be considered because of concerns regarding potential harassment by appellant. Linda Vanover, appellant's other sister, was not approved by CSB, though she contended that CSB's record-check was inaccurate. Ms. Vanover told the juvenile court that while she was willing to take the children, she only had a two-bedroom home. None of the relatives filed a motion for legal custody.
 {¶ 28} According to Mr. Pedani, by May 2001, appellant had suitable housing and sufficient food for her children, but was not stabilized in terms of her mental health and was non-compliant as to the terms of her probation. He explained that the case was not stepped down to protective supervision because of ongoing concerns regarding appellant's mental health. Mr. Pedani further stated that, in December 2001, visitations had to be moved from appellant's home to a CSB location because of safety concerns. Appellant had reported being attacked in her own home by the father of her third child.
 {¶ 29} Mr. Pedani stated his belief that appellant spent an excessive amount of visitation time complaining about the foster parents and their care of the children. The witness also reported that appellant reportedly threatened to put his head "through the wall" while they were at the courthouse for a pre-trial on April 25, 2002.
 {¶ 30} Christine Andrews, a therapist at the Counseling Center, testified that she had counseled the oldest child regarding behavior problems. She testified that the child liked her foster family and never expressed a desire to return home.
 {¶ 31} For her part, appellant presented the testimony of several relatives and a neighbor, all of whom maintained that appellant loved her children, provided them with good care, kept a very clean home, was doing well on her current medication, and stated that they stood ready to assist appellant if necessary. Appellant was said to do crafts and play with the children. Appellant was also reported to arrange for the care of the children when she needed to be hospitalized. At the same time, the relatives admitted that appellant has had other periods of stabilization followed by hospitalizations.
 {¶ 32} Appellant's mother, grandmother, and sister all testified that appellant's concerns about poor care of the children by the foster parents were legitimate and that caseworker Pedani did not give her concerns sufficient credence.[3] Family members made efforts to check on appellant daily or to be certain that the oldest child would get on the school bus. Appellant's mother testified appellant has been on her current medication since the end of June 2002, approximately five weeks.
 {¶ 33} Appellant testified in her own behalf. She stated that she was diagnosed with bipolar disorder at the age of 19. Subsequently, she sought treatment through both medical doctors and psychiatrists. She listed at least seven different medications with which she has been treated, some on more than one occasion. She also claimed that she has been on "over a hundred medications." Appellant explained that the medications need to be changed when her body chemistry changes, such as during and after pregnancies. Several of the medications had negative side-effects, such as fatigue or nausea.
 {¶ 34} Appellant testified that she had gotten her GED in November of 2001 and been accepted to Wayne College. She stated that she wanted to further her education so that her children could be proud of her. She wants to better herself. She is still in counseling with a psychiatrist, but has requested a different psychiatrist. She realizes she has no choice but to continue counseling and take medication because of her illness. Appellant also testified to good and reasonable goals for her children in terms of school, activities, church, and providing for their medical needs.
 {¶ 35} Appellant expressed her love for her children and the fact that it is difficult for her not to have them with her. She presented numerous examples of pictures of the children, gifts that she made for them, and gifts that they gave her. She purchased a family YMCA membership so they would have activities to do together.
 {¶ 36} The children's guardian ad litem expressed the opinion that appellant's ongoing mental health problems impair her ability to effectively parent her children and to provide them an adequate permanent home. When stable and on her medication, she exhibits good parenting and provides for her children's needs, but the periods of stability are the exception. Her hospitalizations are frequent and the periods preceding the hospitalizations are often tumultuous. As noted by the guardian ad litem, children need stability and they need to be safe. Appellant's illness, she observed, produces instability and the safety of the children is compromised as a result.
 {¶ 37} The guardian ad litem stated that appellant would exaggerate a concern to the point of great distress or view factors in such a way that her ability to make good and rational decisions regarding her children was impeded. She expressed her belief that the well-being of the children is compromised by appellant's poor insight, poor judgment, and poor impulse control. The guardian ad litem, therefore, recommended that the children should be placed in the permanent custody of CSB.
 {¶ 38} On appeal, appellant has made several arguments under a single assignment of error. The arguments will be addressed in turn.
 {¶ 39} First, appellant claims that the evidence fails to establish that her condition is chronic and that such condition precludes her from appropriately parenting her children within a reasonable time. This Court disagrees. At the permanent custody hearing, Dr. Vellanki stated his opinion that appellant's condition was, in fact, chronic. The record indicates that appellant has been hospitalized due to mental health concerns more than twenty-five times, some quite lengthy, over the course of six years with no clear indication of resolution.
 {¶ 40} In addition, Dr. Vellanki testified that, while some individuals with bipolar disorder can be successful parents, appellant's prognosis, in particular, was poor because of the combination of factors presented by her situation: the chronic nature of her condition, coexisting substance abuse, anti-social personality traits, history of non-compliance with medications, and limited insight regarding her condition. The guardian ad litem opined that appellant's ongoing mental health problems impaired her ability to effectively parent her children and provide an adequate permanent home for the children
 {¶ 41} While appellant claims she is stabilized on her current medication, she had been on the medication for only five weeks at the time of the permanent custody hearing. In addition, she had been on the same medication several times in the past and ended up being hospitalized. Both Dr. Zellanki and Mr. Hussar observed that many of appellant's recurring hospitalizations were a result of her non-compliance with prescribed medications. Mr. Gerber also testified that appellant has not been consistent in attending her medical appointments or following her doctors' recommendations.
 {¶ 42} The record also indicates that, even when appellant is not hospitalized, she has demonstrated inappropriate and erratic behavior. Mr. Gerber specifically stated that appellant has not demonstrated stability in terms of mental health in the past eight months. Appellant's best year, in terms of hospitalizations was 2001, but that was also the year that the father of her youngest child attacked her and her friends in her own home, appellant violated the terms of her probation with positive drug screens, she fired her court-appointed counsel, and she was not thought stable enough for the case to be stepped down to protective supervision. Since that time, appellant has been hospitalized six times for mental health reasons, the last time being just two and one-half months before the permanent custody hearing.
 {¶ 43} Appellant next contends that because she has made arrangements for the children in the past, hospitalizations are not an impediment to her parenting. However, the record indicates that while several relatives have offered to step in and help if needed, none have actually sought legal custody and satisfactorily completed home studies with CSB. Some, who provided extensive care in the past, have indicated that they are not able or willing to do so in the future.
 {¶ 44} Next, appellant suggests the court should have considered placing just one or two of the children with her. However, the basis of the court's decision and the evidence presented at the hearing in this matter does not support such a decision. The evidence indicates that appellant suffers from a chronic mental illness which impacts her ability to parent. The evidence further suggests that appellant has a poor prognosis with no indication of stabilization. The court did not determine that it was in the best interest of any of the children to remain in the custody of appellant. Further, the evidence indicated that perhaps the strongest bond the children had was with each other. Separating the children would not have been in their best interest.
 {¶ 45} Appellant also argues that her condition has not endangered her children and that her hospitalizations have not been traumatic to the children. While there was no evidence before the juvenile court that appellant threatened or directly injured her children, the safety and security of the children have been jeopardized numerous times by appellant's failure to consistently comply with her prescribed medications and apparent inability to use good judgment. Further, there was evidence before the court from which it could draw the conclusion that the children had suffered as a result of appellant's repeated hospitalizations. The oldest child was in counseling for a behavior disorder. The child frequently demonstrated distress and confusion at the time of appellant's outbursts and inappropriate behavior during visitations. She would cry, hide under toys, or even attempt to conciliate her mother. The children have spent most of their lives in the custody of people other than their mother. Each removal has been the result of appellant's mental instability. Appellant's suggestion that this is not harmful to the children is demonstrative of the very failure of appellant to realize the need for security and permanence in the lives of her children.
 {¶ 46} Finally, appellant contends that the juvenile court should not have relied on the fact that the two older children were in custody for more than twelve months out of a consecutive twenty-two month period. Ohio's statutory scheme represents an attempt to provide children with stability and security in their lives. The children in the present case have spent the greater portion of their lives in the custody of someone other than their mother. Appellant has attended approximately half of the weekly visitations made available to her. She is a single parent with three children with different fathers, none of whom has provided any support for the children, and who has suffered repeated hospitalizations as a result of chronic mental health problems with no clear indication of resolution. On this record, the juvenile court properly relied on the lengthy custodial history of the children.
 III. {¶ 47} Upon review of the evidence, this Court does not find that the trier of fact clearly lost its way and created a manifest miscarriage of justice. The weight of the evidence supports the judgment of the juvenile court. Appellant's sole assignment of error is overruled. The judgment of the juvenile court is affirmed.
BAIRD, P.J. and WHITMORE, J. CONCUR
[1] The father of the third child appeared in court and voluntarily surrendered his parental rights to the child. The purported fathers of the first and second children were served with notice of these proceedings, but did not appear. The juvenile court found that these two men had abandoned their children.
[2] One aid reported that appellant threatened the foster mother, saying "if she ever saw that [woman] alone on the street *** she would be one sorry woman." The oldest child asked what she would do, but the aid intervened at that point. On another occasion, appellant was angry about a severe haircut given to her oldest child. Appellant reportedly said that she ought to "hunt that foster mother down and hold her down and cut her hair off with a pair of scissors." The child attempted to calm the mother by saying that she liked the haircut.
[3] It seems that CSB handled some of appellant's complaints improperly and the foster parents made some poor decisions, but these matters are not the grounds upon which this Court is making its determination. Nevertheless, this Court feels compelled to comment upon two examples of behavior permitted by CSB or its foster parents which caused unnecessary problems during visitation.
Dressing a bi-racial child in a zebra outfit, not just once, but twice, and after a complaint was registered by appellant is, at the least, insensitive behavior.
Also, the foster family — apparently for no good reason — renamed appellant's third child and became angry if the other children failed to use the new name in their home. When the new name was used during visitation, the appellant became upset and the oldest child was also unnecessarily upset and confused. She began to cry and said, "If I call her B., then [the foster mother] gets mad, if I call her S., you get mad."
A parent struggling to regain possession of her children should not have to cope with such unnecessary provocations, nor should children be subject to such additional stresses.